

# Brooks Roberts vs. United States

Opinion submitted by:

Wyatt Schroeder, Principal
Bowling Business Strategies



# Opinion on Roberts vs. US

## Background

I, Wyatt Schroeder, have worked on the issue of homelessness since 2009. Throughout that time, I have worked in several contexts including:

- Served as the Executive Director of CATCH, a nonprofit focused on addressing family homelessness in the Treasure Valley of Idaho and serving as the lead operating agency for the Ada County homeless response system called Our Path Home.
- Worked as the Director of Community Partnerships in the Mayor's Office at the City of Boise, where I stewarded all social service partnerships, including homelessness and affordable housing issues.
- Worked at Doorways for Women and Children, a domestic violence shelter and service agency supporting families in Arlington, VA.
- Worked at Project HOME in Philadelphia, PA, a supportive housing and social services agency working on the issue of chronic homelessness.
- Since 2020, I have worked as a consultant, supporting multiple communities on their homelessness and housing strategies, including City of Boise, Idaho Housing and Finance Association, House Idaho Collaborative, and City of Ketchum.

The specific focus of my work is on supportive housing, which is a model that combines permanent housing (a lease in the client's own name), supportive services (services like case management designed to match the clinical needs of the client), and rental assistance (a subsidy to pay the rent on the client's behalf for an agreed upon time). Supportive housing is an evidence-based practice that has been endorsed by U.S. Housing and Urban Development and Substance Abuse and Mental Health Services Administration as the most effective way to stably house people with complex care needs. Supportive housing contemplates the best method and services programming to move a household with a disabling condition (either a mental health condition, substance use issue, and/or physical disability) from living on the streets or in shelter to living in a permanent housing situation.

For these reasons, I was contacted by Craig Durham and Ritchie Eppink to provide an expert opinion on the case before us. Specifically, I was asked to diagnosis the state of homelessness in Ada County and in McCall to understand if a client experiencing homelessness has reasonable options given the current housing market, emergency shelter system, and homeless response system.

## Review

To review the dynamics of the homelessness situation in Idaho, I reviewed the following materials:
- Reports on the housing market, especially the City of Boise Housing Needs Analysis (2021) and the McCall Area Local Housing Action Plan (2022)
- Reports on homelessness, including the HUD Housing Inventory Count, HUD Annual Homeless Assessment Report, public data reporting dashboards from Our Path Home (the

homeless response system in Ada County) and Idaho Housing and Finance Association (the homeless response system for Idaho, outside of Ada County).
- Research published by the U.S. Forest Service on their research and development database, including three research articles by Lee K. Cerveny of Pacific Northwest Research Station et al.

In addition to written materials, I also conducted an:
- Interview with Brooks and Judy Roberts.
- Interview with Stephanie Day, Executive Director, and Connor O'Hara, Outreach Program Specialist, of CATCH. This agency worked directly with Brooks Roberts during a period of his homelessness and provided case information on the service relationship and the condition of their homelessness.

## Key Findings

1. **Very few adult-only households experiencing homelessness are housed each year and people should expect to wait at least 2 years for a referral for a program to help.**
   It is incredibly difficult for a household experiencing homelessness to be housed in Ada County. The unaffordability and unavailability of housing makes it a very slow process.

   In 2022, only 18 households (or 3% of all adult-only households assessed in Ada County that year) were referred to supportive housing, which is the type of housing program recommended for people living with mental health conditions and/or physical health disabilities.

   And of the 18 households that were referred to programming; they waited an average of 643 days from the day of their housing assessment to the day that they were accepted by a local service provider into a program. And then waited an average of 122 days from the day of their referral into a supportive housing program and the day they signed a lease for a stable housing apartment. It would stand to reason that a household that was first assessed in August 2022 would not be referred to programming until July 2024 and would not be housed until November 2024. CATCH assessed Brooks Roberts and placed him on the central waiting list in August 2022.

2. **There are not enough emergency shelter beds in Ada County to accommodate adult-only households experiencing homelessness.**
   As households experiencing homelessness wait for housing and for services, it is natural to assume that the emergency shelter system can accommodate the population so that there is no use of public spaces, parks, or public land as camping locations. Unfortunately, there are not enough shelter beds to accommodate.

   At the end of May 2023, there were 934 adult-only households on Ada County's central waiting list for homeless services. This is the pathway for anyone looking for a program that assists them identify housing. Brooks Roberts is considered an adult-only household.

   Reported by the U.S. HUD Housing Inventory Count, there are 500 beds in emergency shelters across Ada County that serve adult-only households. This means there are twice as many people looking for beds each night as there are beds.



Judy Roberts reached out, on behalf of Brooks Roberts, to Interfaith Sanctuary three times in October 2021 to learn more about their shelter. She was informed that there was not room at the shelter and that the shelter could not accommodate their pets or have adequate storage for their property, including an RV. After having her shelter needs unresolved, she stopped calling. As she commented to me, "No one pointed me in any other direction."

3. **Staying in shelter is not a healthy or viable option for every person, especially those living with a disabling condition.**
   There is a common misperception that staying in emergency shelter often and rapidly leads to resolving one's housing crisis. As we have seen, adult-only households experiencing homelessness are slowly and rarely being housed in Ada County. And do not have enough shelter beds to accommodate their nightly lack of housing.

   Further, residing in an emergency shelter is not a healthy or viable option for everyone, especially those living with a disabling condition. Brooks Roberts has a disabling condition, as confirmed by the housing assessment done by CATCH in August 2022. The trauma of homelessness can impair one's brain functioning, and this can be further complicated by staying in a congregate setting like all of the emergency shelters in Ada County. Congregate settings do not allow for privacy, which engenders a feeling of being unsafe and being watched at all times – not conducive to self-care and addressing one's trauma response.

   Brooks Roberts suffered a work-related injury that left him partially incapacitated and was paired with his mother who was living with a disability due to her amputated legs. These disabling conditions would have made it very difficult to reside in emergency shelter.

   Also, Brooks Roberts worked a night shift for employment, which is not compatible with the schedule of emergency shelter. Interfaith Sanctuary asks people to call or visit after 4pm to inquire about shelter. The shelter conducts daytime programming but does not accommodate sleeping during the daytime. Brooks would have had to sever his employment to sleep consistently in a shelter, due to the shelter policy that guests not being allowed to be in the shelter during the day.

4. **The housing and shelter situation puts a strain on our cities and law enforcement can expect to see increased rates of camping.**
   The above concerns about the state of housing and the homeless response system mean that law enforcement can expect to have increased contact with people experiencing homelessness. As the urban crisis struggles to accommodate those experiencing homelessness, we can expect to see increasing rates of people sleeping in places that are not indoors. This will lead to increased use of public lands and public spaces as sleeping areas for those without another viable option.

   Research from the U.S. Forest Service demonstrates that the bureau is contemplating this trend and is considering its social service responsibilities. Law enforcement officials throughout the west have reported increased rates of nonrecreational camping.



## Definition of Homelessness and the Homeless Response System

It is important to know the background on the definition of homelessness and on the structure of the homeless response system in Ada County, ID to understand the available options to someone unhoused in the area.

The U.S. Department of Housing and Urban Development has the standard definition for homelessness and uses this definition to define how eligibility for services flow. According to CFR 578.3, as amended by the McKinney-Vento Homeless Assistance Act:
"Homeless means:

(1) An individual or family who lacks a fixed, regular, and adequate nighttime residence, meaning:

(i) An individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, airport, or camping ground;

(ii) An individual or family living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including congregate shelters, transitional housing, and hotels and motels paid for by charitable organizations or by federal, State, or local government programs for low-income individuals); or

(iii) An individual who is exiting an institution where he or she resided for 90 days or less and who resided in an emergency shelter or place not meant for human habitation immediately before entering that institution;

(2) An individual or family who will imminently lose their primary nighttime residence, provided that:

(i) The primary nighttime residence will be lost within 14 days of the date of application for homeless assistance;

(ii) No subsequent residence has been identified; and

(iii) The individual or family lacks the resources or support networks, e.g., family, friends, faith-based or other social networks, needed to obtain other permanent housing;

(3) Unaccompanied youth under 25 years of age, or families with children and youth, who do not otherwise qualify as homeless under this definition, but who:

(i) Are defined as homeless under section 387 of the Runaway and Homeless Youth Act (42 U.S.C. 5732a), section 637 of the Head Start Act (42 U.S.C. 9832), section 41403 of the Violence Against Women Act of 1994 (42 U.S.C. 14043e–2), section 330(h) of the Public Health Service Act (42 U.S.C. 254b(h)), section 3 of the Food and Nutrition Act of 2008 (7 U.S.C. 2012), section 17(b) of the Child Nutrition Act of 1966 (42 U.S.C. 1786(b)), or section 725 of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a);

(ii) Have not had a lease, ownership interest, or occupancy agreement in permanent housing at any time during the 60 days immediately preceding the date of application for homeless assistance;

(iii) Have experienced persistent instability as measured by two moves or more during the 60-day period immediately preceding the date of applying for homeless assistance; and

(iv) Can be expected to continue in such status for an extended period of time because of chronic disabilities; chronic physical health or mental health conditions; substance addiction; histories of domestic violence or childhood abuse (including neglect); the presence of a child or youth with a disability; or two or

more barriers to employment, which include the lack of a high school degree or General Education Development (GED), illiteracy, low English proficiency, a history of incarceration or detention for criminal activity, and a history of unstable employment; or

(4) Any individual or family who:

(i) Is fleeing, or is attempting to flee, domestic violence, dating violence, sexual assault, stalking, or other dangerous or life-threatening conditions that relate to violence against the individual or a family member, including a child, that has either taken place within the individual's or family's primary nighttime residence or has made the individual or family afraid to return to their primary nighttime residence;

(ii) Has no other residence; and

(iii) Lacks the resources or support networks, e.g., family, friends, and faith-based or other social networks, to obtain other permanent housing."

The client household in question was first identified in Ada County, ID, which means their homeless situation would have come under the jurisdiction of the Boise City/Ada County Continuum of Care, commonly known as Our Path Home. It would be the purview of this public-private partnership to navigate Brooks Roberts from homelessness to stable housing.

Typically, that navigation of care would take a few phases:

1. **Access** – To access services, Brooks Roberts would need to contact (or be contacted by) Our Path Home which manages the centralized intake for anyone experiencing homelessness in Ada County. CATCH serves as the operating entity on behalf of the Our Path Home partnership, so for all actions referenced in this brief, CATCH and Our Path Home will be used interchangeably. During this intake, the client household would take a 'housing assessment' from intake workers to understand the nature of their homelessness and a self-report on the severity of their need for supportive services. Based on the assessment, the household would be placed on the central waiting list.

    The waiting list is organized based on the severity of need. In short, there are three tiers of severity for the waiting list:

    1) Permanent Supportive Housing (most severe need) – this is the highest level of service offered to people. This level of need assumes that someone has been experiencing homelessness for a long time (12+ months) and has a disabling condition.

    2) Rapid Rehousing and Transitional Housing (second most severe need) – this is programming for people who have demonstrated the ability to becoming stable rapidly once matched with an appropriate program and supportive service workers. Typically, the people who succeed in this program have experienced homelessness for around 1-11 months and do not have a disabling condition.

    3) Mainstream Resources (least severe need) – this is the lowest tier of support. People at this severity level can navigate their own housing crisis with little-to-no support from nonprofit service workers. They likely already have stable income and do not have a disabling condition.

    While waiting to be referred to a program, clients will often manage their homelessness in various ways, including staying in emergency shelter (if one is available and appropriate) for a time, sleeping in an unsheltered situation, or moving in with friends or family for a short time. It

is a rare scenario when the process moves quickly, especially in expensive and constrained housing markets like Boise, so a client household is likely to avail themselves of any and all options available while waiting to hear from Our Path Home that they have been referred to a housing program.

2. **Referral** – Based on the results of the housing assessment, Our Path Home will place the household into one of the three tiers of severity mentioned above. The next available program opening will be given to the eligible household with the highest level of severity. Someone is only referred to a program once there is an opening. There are less program openings in a year than people waiting on the waiting list, so the process can take months to years for a person to be referred.

3. **Housing –** Once referred into a program, the case management staff will work with the client household to identify a suitable permanent housing unit that meets the client's needs. Upon being accepted by the landlord, the client will move into the housing unit and continue to work with the program until they graduate.

    Clients will be referred into programs that match their level of severity. For instance, people whose housing assessment recommend "permanent supportive housing", the highest level of severity, will be matched with a permanent supportive housing program. Those who are referred to a permanent supportive housing are not expected to navigate their own housing crisis successfully without help from a service program.

This process can vary widely depending on available program resources, the severity of someone's homelessness, the availability of a social network to support someone experiencing homelessness, the availability and quality of emergency shelter, and available financial resources.

## The Data on the State of Homelessness in Ada County

Brooks Roberts conducted his housing assessment on August 9, 2022. The assessment determined two important details:
1) Brooks Roberts had been experiencing homelessness for longer than 12 months.
2) Brooks Roberts had a disabling condition.

For these reasons, he required 'permanent supportive housing' to resolve his homelessness. He was placed on the centralized waiting list for Ada County to wait for a referral to a permanent supportive housing program.

**How large is the waiting list for homeless services in Ada County?**
According to Our Path Home's public data dashboard, there were 569 adult-only households assessed in 2022. Brooks Roberts is considered an adult-only household. According to the Our Path Home data dashboard, as of May 2023, there were 934 adult-only households waiting on the centralized list. The list has continued to grow over the years, indicating that there is not sufficient programming and/or affordable housing to stable house adult-only households experiencing homelessness.

It should be noted that the number of families experiencing homelessness on the Our Path Home waiting list in Ada County has decreased since 2019. This demonstrates that local resources are being targeted to families with children under the age of 18 and that programming is successful when made available to family households. The same housing stability is possible for adult-only households, but

only when local resources exist for adult-only households. The size of the central
waiting list in Ada County for adult-only households and the length of time an adult-only household waits from the day of assessment to the day of referral demonstrates that local resources in Ada County are not available in large enough quantities to serve the local need. Because of this disparity, Brooks Roberts would have to wait a long time to receive the assistance he required to end his homelessness and secure stable housing.

The Our Path Home housing assessment recommended Brooks Roberts for "permanent supportive housing." This is dedicated for clients with a disabling condition and experiencing long-term homelessness and the most intensive of three "supportive housing" programs. There are three options for supportive housing programming in Our Path Home (and all jurisdictions around the country):
1. **Permanent supportive housing** – this is permanent housing with a lease in the household's name that is connected to long-term rental assistance like a Housing Choice Voucher and intensive supportive services. It is designed to meet the needs of people with persistent mental illness and substance use challenges.
2. **Rapid rehousing** – this matches households with a permanent housing unit with a lease in the household's name. And provides rental assistance for a period, typically, between 3-24 months. And provides supportive services provided during that period of rental assistance. This program is most effective for a household with economic hardships and limited supportive service needs.
3. **Transitional housing** – this is a time-limited housing option (up to 2 years by federal standards) that places a household in a unit and provides them rental assistance and supportive services to transition them into a permanent housing unit by the end of the program tenure.

**How many units are typically available for these supportive housing programs in Ada County?**
According to the Housing Inventory Count published by U.S. HUD annually, the following number of units were dedicated to "adult-only households" which would have included Brooks Roberts since there were no identifiable children under the age of 18 in the household.

| Ada County, ID FY2022 | Adult-Only Bed Count |
|---|---|
| Permanent Supportive Housing | 281 |
| Rapid Rehousing | 4 |
| Transitional Housing | 97 |

However, it needs to be clear that because a housing apartment (called "bed" above) exists for these programs does not mean that there was vacancy during 2022 for a new household to move in. There are already people living in these housing units. To understand how often a "bed" is becoming available for a new person, we need to review how many adult-only households are securing stable housing in 2022.

**How many new households experiencing homelessness were housed during 2022?**

| Total Adult-Only Households Referred to Housing During 2022 | 97 |
|---|---|
| *Referred to Housing that was NOT supportive housing programming* | 79 |
| *Referred to Permanent Supportive Housing* | 17 |
| *Referred to Rapid Rehousing* | 1 |
| *Referred to Transitional Housing* | 0 |

Of the 569 adult-only households that received an assessment by Our Path Home in 2022, only 97 (17%) found housing. While only 18 (3%) were referred to a supportive housing program (either permanent supportive housing, rapid rehousing, or transitional housing) that would assist those with a disabling condition and service needs. 79 households were able to find housing without the use of a supportive housing program. This option (finding housing without using a supportive housing programming) is not recommended for Brooks Roberts because his assessment recommended the use of the supportive housing program called permanent supportive housing, because of his homelessness over 12 months and existence of a disabling condition.

Of the 18 being housed in 2022 through a supportive housing program, it took on average of 643 days (and a median of 531 days) for those households from the day of their housing assessment to the day of their referral. Once a referral is accepted by a supportive housing program, the case management staff will work with the client to identify stable housing. This presents another waiting period – the time from an accepted referral to a supportive housing program and the time when a client signs a lease to a stable housing apartment. It took an average of 122 days (and a median of 81 days) from date of referral to the date of a signed lease.

| Length of Time from Assessment to Supportive Housing Referral to Signing a Lease<br><br>All Supportive Housing Referrals in 2022 (n = 18) | Average # of Days | Median # of Days |
|---|---|---|
| *Time from Housing Assessment to Supportive Housing Referral* | 643 days | 531 days |
| *Time from Supportive Housing Referral to Signing a Lease* | 122 days | 81 days |
| Total Time for an Adult-only Household to be housed through Supportive Housing | 765 days | 612 days |

It would stand to reason that a household that was first assessed in August 2022 would not be referred to programming until July 2024 and would not be housed until November 2024. Our Path Home (operated by CATCH) assessed Brooks Roberts and placed him on the central waiting list in August 2022.

This suggests how difficult it is in Ada County to identify and move into housing once you start experiencing homelessness. Only a small fraction received a referral to supportive housing (3%) and those that received a referral waited nearly 2 years for that referral. The greatest impediment to this trend is the unaffordability and unavailability of housing in Ada County.

**What is the role of outreach workers in the homeless response system?**
 CATCH, in addition to conducting housing assessments on behalf of Our Path Home, also operate a "street outreach team", which builds relationships with people experiencing homelessness who are not frequently using the emergency shelter system. Connor O'Hora, an outreach worker with CATCH, made contact with Brooks Roberts in June 2022. By building a relationship with Brooks Roberts, Mr. O'Hora delivered food and water to Brooks Roberts and worked with Brooks Roberts to come into CATCH for a housing assessment.

This is the primary function of a street outreach program – deliver basic needs like food and water, build a service relationship, work on updating documentation like a driver's license, signing up for income through Social Security Administration (if eligible), and connecting the client with CATCH to conduct a housing assessment.

A street outreach program, it should be noted, is not considered a supportive housing program like permanent supportive housing. Brooks Roberts, even though he was connected with Mr. O'Hora, would only receive the intensive supportive services he required once his housing referral was accepted off the centralized waiting list.

## The Impact of Housing in Ada County

Through numerous social science research, we have learned the importance of housing on a person's health. On a community wide scale, a research book called Homelessness is a Housing Problem: How Structural Factors Explain U.S. Patterns by Gregg Colburn and Clayton Page Aldern details how homelessness, as a regional issue, can be primarily explained by the availability and affordability of housing.

In short, in communities that have high value of housing, high cost of rent, and low availability of affordable housing, we would expect to see homelessness increasing.

The City of Boise, in consultation with myself and Agnew::Beck Consulting, conducted a Housing Needs Analysis in 2021. This study identified a number of trends, including these trends relevant to this opinion:

1. **Housing demand has increased:** The City of Boise requires 2,770 units every year for the next 10 years to meet demand; 77% of this demand is for housing affordable to those earning 80% or less of the area median income.

2. **Construction is not keeping up with demand**: Over the previous 3 years before 2021, housing construction in Boise produced 4,146 units less than the population need for housing.

3. **Specialized populations have unique housing needs**: Homelessness, increases in refugee resettlement, and student enrollment create specific needs for dedicated housing development that the market is not accommodating.

Housing is becoming more expensive in Boise and this has an acute impact on households like the Roberts family. The data from Our Path Home above and from the City of Boise Housing Needs Analysis suggest that is incredibly difficult for someone experiencing homelessness to find stable housing in Ada County. And if housing is identified, it takes years for an adult-only household to identify it.

Brooks Roberts, after being displaced from BLM land outside of Kuna and relocating outside of McCall, would have experienced similar housing shortages in the McCall area. The McCall Area Local Housing Action Plan (released in 2022) estimated that the area was 730 housing units short of meeting local demand for stable housing.



# Sheltering and Public Lands While Searching for Housing

It is my opinion that the housing conditions and the status of the homeless response system in Ada County that any household would have a challenging time addressing their homelessness in a healthy and rapid way. It is not humane to ask for people, especially those with chronic health issues or acute crises, to expect to wait at least 2 years to be referred to a program that combines intensive services and permanent housing.

Still, the data suggests that hundreds of people are in that condition each year in Ada County. What is reasonable to expect of people experiencing homelessness while they wait to be referred to a supportive housing program?

It is unreasonable to expect Brooks Roberts to use the shelter system in Boise, simply because he does not have an apartment to call his own. Brooks Roberts' mother called Interfaith Sanctuary three times in October 2021 and did not receive positive answers to her question. It was Brooks Roberts' understanding that they could not bring their pets (a dog and a cat) with them into shelter, they could not store their property, including their RV, while they used the shelter, and that the shelter could not accommodate Brooks Roberts' work schedule since he worked the overnight shift at Walmart. These factors of shelter protocols made it unreasonable for Brooks Roberts to use emergency shelter for overnight stays.

People in long-term homelessness will transition between using emergency shelter, staying with friends or family on a couch or in a spare room, camping in an unsheltered situation, using emergency room or crisis medical facilities, and other alternatives. It is a common misunderstanding that once a person experiencing homelessness stays once in emergency shelter that they remain in emergency shelter until they resolve their housing crisis. The instinct among law enforcement is to ensure that a person is engaging in the shelter system in their area, but staying in shelter is not a healthy or feasible option for many people, especially those with a disabling condition like Brooks Roberts.

Considering this, I would encourage four important perspectives in the dynamics of using emergency homeless shelter and their impact on the expectations for a client like Brooks Roberts:

- **Overnight shelters are not compatible with people who work overnight shifts.** Brooks Roberts worked at Walmart on the third shift, which would not fit with an emergency shelter schedule. Shelters in Boise open up only in the evening and then ask all guests to leave in the morning. For instance, Interfaith Sanctuary in Boise opens to overnight guests at 5pm and then closes again at 7am. This would have required Brooks to leave his job to fit the schedule of shelter beds in Boise.
- **Staying in emergency shelter can be difficult for people with a disabling condition.** Staying in shelter would not have been a healthy place for Brooks Roberts due to his disabling condition. This is especially true for congregate shelters, where there is no private sleeping space for any guests. All shelters in Boise are congregate living. Homelessness is an acute trauma that science has shown to have a negative impact on brain functioning. Sleep deprivation is a key symptom of homelessness. Lack of sleep is common in congregate shelter due to the noise and the lack of privacy. Extended homelessness has a compounding impact on brain functioning and

decision-making. While staying in shelter has the chance to connect to limited social services, it does not remove the unhealthy impacts of homelessness.

- **Staying in shelter does not often lead to stable housing placement.** It is expected that Brooks Roberts will wait at least two years to be referred to a supportive housing program. It is a misperception that staying in emergency shelter inherently increases someone's ability to find stable housing. Sleeping in shelter does not speed up Brooks Roberts' chance of being referred to the permanent supportive housing program that his housing assessment recommended.
- **There is not enough shelter space.** The HUD Housing Inventory Count reports that in 2022 there were 500 beds for adult-only households in Ada County. As of May 2023, there were 934 adult-only households waiting on the centralized list. /There are only available beds for 1 out of every 1.9 adult-only households. Even if Brooks Roberts sought out a shelter bed, it is unlikely that one would have been available every night for the entire duration of their homelessness. And as they moved to McCall, it should be noted that there are no shelter beds in Valley County. The closest available emergency homeless shelter beds in McCall are in Boise.

Given the scale of homelessness in Ada County and the availability of shelter beds, it is unsurprising that people are utilizing urban parks and rural public land to accommodate their homelessness. This dynamic led to the Martin vs. Boise court case that defined the relationship between ticketing for urban camping based on availability of shelter space. As a City of Boise police officer told me once, "we are squeezing the toothpaste tube." The people sort from one area to another after each interaction from law enforcement, but the dynamics of homelessness do not change. As urban-based policing further works to move homelessness out of downtowns and city parks and the availability of housing continues to decrease, it should be expected that places like public land will see increased rates of homelessness.

This perception is felt by U.S. Forest Service law enforcement officers, according to a 2019 study by Lee Cerveny, a research social scientist with the Forest Service's Pacific Northwest Research Station. In that study, 40% of officers in Intermountain Region (encompassing Idaho) reported seeing an increase in 'nonrecreational campers' in the region.

Interactions between people experiencing homelessness and BLM or Forest Service officers will likely only increase in the Ada County region. Those interactions should be handled with care.
Urban-based police departments have adjusted their core functioning in this space, because of the on-going housing and homelessness crisis. For instance, City of Boise hired a behavioral health specialist a little less than a decade ago, recognizing the expanding role of community policing. While I was working for the City of Boise, the department expanded that role into hosting a Behavioral Health Response Team, including two sworn officers and two civilian Mental Health Counselors. This response demonstrates a path forward for federal officials confronting homelessness on public lands. Enforcement must be coupled with a social service and behavioral health response. BLM appears to understand this as it engaged CATCH's outreach team in working with Brooks Roberts initially. Federal officials must continue to recognize that Brooks Roberts will experience homelessness on average for 2 years before receiving a supportive housing referral and may be a continued presence on public land.

The Forest Service acknowledges this in the September 2021 issue of "Science Findings", its research and development publication. "While there are no one-size solutions currently available for land managers, strategies are being discussed and explored, including having a social worker ride-along with

[law enforcement officials], developing clear signage about camping rules, and developing a professional network of land managers and social and health providers to share information locally."